Eva FRITIOFSON, et al. Plaintiff,

v.

Clifford ALEXANDER, Jr., Secretary of the Army, et al., Defendant.

Civ. A. No. G–78–188.

United States District Court,
S.D. Texas,
Galveston Division.

March 2, 1984.

On Motion For Reconsideration
Aug. 21, 1984.

Robert M. Moore, Galveston, Tex., for plaintiff.

Jack Shepherd, Asst. U.S. Atty., Robert N. Hinton, Jr., Charles Newton, Jr., Vinson & Elkins, Houston, Tex., for defendant.

## MEMORANDUM AND ORDER

HUGH GIBSON, District Judge.

Plaintiffs, a group of residents and property owners of the City of Galveston, challenge the United States Army Corps of Engineers' (Corps) issuance of a permit authorizing Mitchell Development Corporation of the Southwest (Mitchell) to construct a 188 acre "venetian" canal housing development along Eckert's Bayou on west Galveston Island, Texas. Plaintiffs allege that the Corps violated the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq*, by failing to prepare an environmental impact statement (EIS) analyzing the cumulative impact of the proposed Mitchell project on the aquatic ecosystem of west Galveston Island and West Bay. The defendants contend that the Corps' decision to issue the Mitchell permit without first preparing an EIS was in accordance with all applicable legal requirements. Both sides have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The case file, administrative record, an oral hearing, and the exhaustive briefs filed by the parties indicate the absence of any genuine issue of material fact. The case is therefore ripe for decision.

# I.

## BACKGROUND

On July 20, 1974, Mitchell submitted an application for a Department of the Army permit to dredge canals and erect piers and bulkheads in West Bay and Eckert's Bayou, as part of its proposed canal development on west Galveston Island known as Pirates Cove Subdivision, section 6.[1] On June 28, 1976, the Corps approved Mitchell's permit application without having first prepared an EIS. Exercising its rights under the Corps permit, Mitchell began construction of its canal development in July 1976, by dredging a channel across wetland areas, connecting Dale-hide Cove with Eckert's Bayou.

After acquiring additional developable acreage adjacent to the original project site, Mitchell submitted an application to the Corps on February 23, 1978, seeking an amendment to the existing permit authorizing the project size to be increased from 145 acres to 190 acres. In August of 1978, while the Corps was considering Mitchell's application for an amended permit, the plaintiffs commenced the instant suit. Their complaint asked this court to enjoin Mitchell from performing any further construction under the original permit and to order the Corps to prepare an EIS. After conducting a four day evidentiary hearing on plaintiff's request for a preliminary injunction, the Honorable Finis E. Cowan enjoined Mitchell, on September 15, 1978, from proceeding with any significant work under the Corps permit, pending a trial on the merits.

On September 25, 1979, Mitchell filed a revised application to amend the original permit and on May 20, 1980 withdrew the outdated February 23, 1978 amendment request. The revised amendment application proposed a 188 acre development comprised of 378 single family lots and 81 townhouse units.

**1.** Mitchell sought permits pursuant to Section 404 of the Federal Water Pollution Control Act (Clean Water Act), 33 U.S.C. § 1344, and Section 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403.

At the request of all counsel of record, this court, in January, 1981, indefinitely continued the trial of this cause pending the Corps' completion of its administrative review of Mitchell's revised amendment application.

On December 3, 1982, the Corps issued Mitchell an amended permit. Plaintiffs now ask this Court to order the Corps to prepare an EIS and to revoke or hold in abeyance Mitchell's permit until the EIS has been completed.

## II.

### STANDARD OF REVIEW

■ NEPA requires federal agencies such as the Corps to prepare an environmental impact statement for all "major Federal actions significantly affecting the quality of the human environment". 42 U.S.C. § 4332(2)(C). The law is well settled in the Fifth Circuit that when an agency makes the determination not to prepare an EIS, the reviewing court uses a "reasonableness" standard to test the agency's decision. *See, e.g., Save Our Wetlands, Inc. v. Sands,* 711 F.2d 634, 644 (5th Cir. 1983); *Sierra Club v. Hassell,* 636 F.2d 1095, 1097 (5th Cir.1981); *Hiram Clarke Civic Club, Inc. v. Lynn,* 476 F.2d 421, 424 (5th Cir.1973); *Save Our Ten Acres v. Kreger,* 472 F.2d 463, 466–67 (5th Cir.1973). If the agency's determination "is reasonable and made objectively and in good faith on a reviewable environmental record", the determination must be upheld. *Save the Bay, Inc. v. United States Corps of Eng.,* 610 F.2d 322, 325 (5th Cir.1980). In order to determine the reasonableness of an agency's actions,

> [a] reviewing court is to review the administrative records as well as other evidence to determine whether the agencies adequately considered the values set forth in NEPA and the potential environmental effects of the project before reaching a decision on whether an environmental impact statement was necessary. If the agencies engaged in this analysis and reasonably concluded on the basis of their findings that an impact

statement was not required, their determinations will be upheld.

*Save Our Wetlands, Inc. v. Sands,* 711 F.2d 634, 644 (5th Cir.1983) (quoting *Sierra Club v. Hassell,* 636 F.2d 1095, 1097–98 (5th Cir.1981)).

■ Before a court need even consider the reasonableness of the agency's decision, however, the plaintiff must first raise a "substantial environmental issue" concerning the proposed approved project. *Environmental Defense Fund v. Marsh,* 651 F.2d 983, 992 (5th Cir.1981); *Save Our Ten Acres v. Kreger,* 472 F.2d 463, 466–67 (5th Cir.1973). In order to raise a "substantial environmental issue," the plaintiff must allege "facts which, if true, show that the recommended project would materially degrade any aspect of environmental quality". *Id.* at 466.

Based on the voluminous evidence submitted, including the four day evidentiary hearing which prompted the September 15, 1978 order of Judge Cowan to enjoin Mitchell because its project had already created "serious, irreversible ecologic damage," the Court is convinced that plaintiffs have raised substantial environmental issues. Accordingly, the Court must now examine whether the Corps "adequately considered the values set forth in NEPA and the potential environmental effects of the [Mitchell] project" to determine the reasonableness of the Corps' decision not to prepare and EIS. *Save Our Wetlands, Inc. v. Sands,* 711 F.2d 634, 644 (5th Cir.1983).

## III.

### NEPA AND THE NEED FOR AN EIS

■ As previously mentioned, NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment". 42 U.S.C. § 4332(2)(C). The definitions applied to the above quoted words are determinative of the controversy in a lawsuit such as the instant one because an EIS is not required for a non-major action, or a major action which is non-federal or which

does not significantly affect the environment. *See, e.g. Bradley v. United States Dept. of Housing & Urban Dev.,* 658 F.2d 290, 293–94 (5th Cir.1981); *Sierra Club v. Hassell,* 636 F.2d 1095, 1097 (5th Cir.1981). Federal agencies, and ultimately the courts, however, do not have unbridled discretion in defining and construing the terms which comprise the statutory requirement for an EIS. Rather, the Council on Environmental Quality (CEQ), established by Title II of NEPA, 42 U.S.C. § 4341 *et seq,* has promulgated comprehensive definitions, 40 C.F.R. § 1508 (1982) *et seq.,* which "shall be uniform throughout the Federal Government". *Id.* at § 1508.1. It is well-established that the CEQ's regulations implementing NEPA are binding on all Federal agencies and the courts. *Sierra Club v. Sigler,* 695 F.2d 957, 964, 972 (5th Cir.1983). In determining whether the Corps acted reasonably in not preparing an EIS before approving Mitchell's amended permit application, the Court must therefore review the Corps' decision in light of the binding definitions set forth in the CEQ's regulations.

When the Corps issued Mitchell an amended permit in December, 1982, it stated: "this [Mitchell] project will not have a significant effect on the human environment, and therefore does not require an Environmental Impact Statement (EIS)". Environmental Assessment, page 11, AR 17:297.[2] The operative word in the instant

controversy is thus "significant".[3] According to CEQ regulations,

> "Significantly" as used in NEPA requires consideration of both context and intensity: (b) *Intensity.* This refers to the severity of impact ... The following should be considered in evaluating intensity:
>
> (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts. 40 C.F.R. § 1508.27 (1982).

The CEQ regulations also define cumulative impact:

> "Cumulative impact" is the impact on the environment which results from the environmental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. *Id.* at § 1508.7.

The above regulations clearly require the Corps to analyze cumulative impact, and the Corps' alleged failure adequately to consider the cumulative impact of the

---

**2.** The Administrative Record concerning Mitchell's permit applications has been filed with the Court. In this memorandum, citations to the Administrative Record are given as AR, followed by the volume number, a colon, and then the page number. Thus AR 1:18, stands for volume one, page eighteen.

**3.** Because both the Corps and Mitchell have formulated their arguments in terms of whether the proposed project will significantly affect the quality of the human environment, both parties apparently concede that the project constitutes a major federal action. Nonetheless, the Court is convinced that a major federal action exists. Federal law charges the Department of the Army with regulating construction, dredging, filling or disposing of material in the navigable waters of the United States. *See* 33 U.S.C. § 403 & § 1344. And before a private party may

commence any dredging or construction, a permit from the Corps of Engineers is required. Although the Court is aware that a "private act does not become a federal act, albeit a 'major' one, merely because of some incidental federal involvement", *Save Our Wetlands, Inc. v. Sands,* 711 F.2d 634, 644 n. 9 (5th Cir.1983), the Court is of the opinion that Mitchell's application for a Corps permit, pursuant to 33 U.S.C. § 403 and § 1344, is sufficient to "federalize" the present action. In support, the Court notes that the Fifth Circuit recently recognized that the Corps' decision to issue permits, pursuant to 33 U.S.C. § 403 and § 1344, sufficiently "federalized" a non-federally funded proposed superport project to make the project subject to NEPA. *See Sierra Club v. Sigler,* 695 F.2d 957, 965 (5th Cir.1983).

Mitchell project on the ecosystem of west Galveston Island and its adjacent waters is the gravamen of the plaintiffs' complaint.[4]

The Court's review of the administrative record reveals that the Corps did acknowledge the importance of considering cumulative impact. One month prior to granting Mitchell's original permit application in June of 1976, the Corps stated:

"West [Galveston] Bay is, at the current time, relatively pristine in relation to the remainder of the Galveston Bay system and if we are to prevent damage to the West Bay Environment, then each specific project in that locale must be carefully scrutinized for both potential environmental impact as well as its contribution to cumulative effects on the ecosystem." AR 1:261.

In a separate document of the same date, however, the Corps stated:

In the absence of any study concerning Galveston Island, the cumulative effects of this and similar projects cannot be estimated with any degree of success. AR 1:268.

Nevertheless, the Corps approved Mitchell's original permit application in 1976 without first conducting a cumulative effects study or preparing an EIS. Again, in granting Mitchell's amended permit application in June of 1982, the Corps' Environmental Assessment document summarized its analysis of the cumulative impact of the Mitchell development by stating:

In the absence of any other studies concerning Galveston Island by the City or other governmental entity, the Corps of Engineers must evaluate each permit on an individual basis, carefully examining the environment of West Bay with each permit application. AR 17:296.

The Corps' Environmental Assessment document also summarized the specific consideration given to the term "significantly" as defined by the CEQ regulations. 40 C.F.R. § 1508.27 (1982). As regards the cumulative impacts aspect of the CEQ's definition quoted above, the Corps concluded that:

this development is not related to any overall plan, by the applicant or other developers, to provide additional waterfront housing on Galveston Island. AR 17:299.

The Court's extensive review of the administrative record and the case file indicates that the Mitchell development is "related" to other "past, present and reasonably foreseeable future actions" as contemplated by the CEQ regulations. *See* 40 C.F.R. § 1508.27 & § 1508.7 (1982). In its 1979 application for an amended Corps permit, Mitchell volunteered that its revised enlarged development plan provides for "possible future project expansion". AR 14:58. And in a December 1974 letter to the Corps concerning Mitchell's original permit application, the National Marine

---

**4.** Although the Court's consideration of cumulative impact is limited to how the CEQ regulations employ and define the term, the Corps' own regulations, designed to supplement the CEQ regulations implementing NEPA, 33 C.F.R. § 230.1 (1983), also discuss the concept of cumulative impact. *See Id.* at § 320.4 (1983). The Corps regulations mandate that in reviewing all applications for Corps permits:

The decision whether to issue a permit will be based on an evaluation of the probable impact including cumulative impacts of the proposed activity and its intended use on the public interest ... [a]ll factors which may be relevant to the proposal must be considered including the cumulative effects thereof ... *Id.* at § 320.4(a)(1)

When a permit application involves important wetlands, such as the instant case, the Corps regulations further state that:

(3) Although a particular alteration of wetlands may constitute a minor change, the cumulative effect of numerous such piecemeal changes often results in a major impairment of the wetland resources. Thus, the particular wetland site for which an application is made will be evaluated with the recognition that it may be part of a complete and interrelated wetland area. In addition, the District Engineer may undertake reviews of particular wetland areas in consultation with the appropriate Regional Director of the Fish and Wildlife Service [and] the Regional Director of the National Marine Fisheries Service ... to assess the cumulative effect of activities in such areas. *Id.* at § 320.4(b)(3).

Plaintiffs in the instant suit allege, *inter alia,* that the Corps violated its own regulations.

Fisheries Service expressed their concern with "the cumulative effects of the proliferation of waterfront housing development" on the West Bay estuary because "[t]en such developments with box-cut canals already exist along West Bay and its tributary bayous, and the Mitchell Corporation has plans for several other sections of waterfront housing development in the Hoeckers Cove-Tucker Bayou area".[5] AR 1:115. The United States Fish and Wildlife Service has expressed similar concern to the Corps. In a May, 1983 letter to the Corps, concerning not the Mitchell development but a County of Galveston application to construct two offshore breakwaters as "an integral part of a large (1100 acres) housing development planned by Homecraft Land Development, Inc." on west Galveston Island, the U.S. Fish and Wildlife Service stated:

> The development of Galveston, especially west Galveston Island, has been proceeding at an increasing rate. Many of these developments have required Department of the Army [Corps] permits, but others have not. Any of these developments,

when considered alone, may be acceptable. However, the cumulative impact, especially on wetlands, has been substantial ... Development incentives (redevelopment zones) and proposals have increased since 1979 placing the remaining wetlands under even greater pressure. Exhibit A, Plaintiffs' Response to Amicus Curiae Brief of Homecraft Land Development, Inc.

■ The Mitchell project is clearly related to other past, present, and reasonably foreseeable developments on west Galveston Island. The Corps therefore abdicated its responsibility under NEPA by failing properly to consider cumulative impacts and instead evaluating the Mitchell permit application commensurate with, and narrowly confined to, its stated policy of evaluating "each permit on an individual basis". AR 17:296. Accordingly, the Corps' determination that an EIS is not required under NEPA, because the Mitchell project will not significantly affect the environment, is not sufficiently supported by the environmental record and is hence unreasonable and arbitrary.[6]

---

**5.** The National Marine Fisheries Service's December 1974 letter further stated:

> We fear that such development may be approaching the level whereby the quality of water and habitat throughout West Bay would become degraded.
>
> We, therefore, further recommend that an Environmental Impact Statement be prepared by the Corps of Engineers under the provisions of the National Environmental Policy Act of 1969 before granting any permits for future waterfront housing developments in West Bay or its tributary bays and bayous. The Environmental Impact Statement should address questions such as: (1) How much more waterfront housing development can occur in West Bay before the water and habitat quality is degraded throughout the Bay?; (2) What modifications can be made in the design of future developments to minimize or eliminate cumulative habitat degradation?; and (3) What modifications can be made to existing developments to reduce their contribution to water and habitat degradation?
>
> The studies already conducted by the applicant for this permit, and those conducted by the NMFS in West Bay could greatly facilitate the preliminary assessment. Some of the key personnel involved in the latter studies are now on the staffs of your Environmental Re-

sources Section and our Environmental Assessment Division.

In a series of at least five subsequent letters to the Corps, from April 1975 to July 1982, the National Marine Fisheries Service reiterated its concerns for the cumulative impact of numerous future canal-type developments in West Bay, and re-emphasized its opinion of the need for an EIS for subsequent waterfront housing developments. See AR 1:179; 15:120; 15:235; 17:185; 17:260.

It should be noted that when important wetland areas are involved, such as in the instant case, the Corps' own regulations suggest that the Corps consult with the National Marine Fisheries Service to evaluate the cumulative effect of activities in wetland areas. 33 C.F.R. § 320.-4(b)(3) (1983). Corps of Engineers regulations further provide that the Corps, in evaluating a permit application, "will give great weight" to the National Marine Fisheries Service's views on fish and wildlife considerations. *Id.* at § 320.-4(c).

**6.** The Court also sets aside the Corps' finding, as regards the cumulative impact aspect of the CEQ's definition of the term "significantly", that the Mitchell "development is not related to any overall plan, by the applicant or other developers, to provide additional waterfront housing on

## IV.

### THE APPROPRIATE REMEDIES

Because the Corps is in violation of NEPA, this Court must fashion a remedy to fulfill, as closely as possible, the objectives of the statute. *Environmental Defense Fund v. Marsh*, 651 F.2d 983, 1005 (5th Cir.1981). Congress enacted Section 102(C) of NEPA, 42 U.S.C. § 4332(2)(C), to insure that high quality environmental information is available for Federal agencies to consider before decisions are made and actions are taken. *Kleppe v. Sierra Club*, 427 U.S. 390, 409, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976). In order to fulfill this objective, the Court orders the Corps to prepare an EIS which addresses the cumulative impact of the proposed Mitchell project on west Galveston Island and West Bay, taking into consideration all past, present and reasonably foreseeable developments. The preparation of such a comprehensive EIS, which complies with all NEPA requirements, both procedural and substantive, will enable the Corps properly to consider the environmental impact of its actions in reviewing Mitchell's amended permit application. Based on the extensive studies already conducted by Mitchell, the National Marine Fisheries Service, and other agencies, the Corps' preparation of an EIS should not be an overly burdensome task. In order to preserve the status quo pending the Corps' completion of the EIS, the Court further orders that the preliminary injunction ordered by Judge Cowan in 1978, enjoining Mitchell from proceeding with any significant work under the original Corps permit, shall remain in effect until the Corps completes the EIS in accordance with this order.

For the reasons stated in this memorandum, it is accordingly ORDERED, ADJUDGED and DECREED that plaintiffs' motion for summary judgment is GRANTED and defendants' joint motions for partial summary judgment and summary judgment are DENIED.

### On Motion For Reconsideration

Upon considering co-defendants' joint motion for reconsideration and to amend judgment, plaintiffs' response thereto, the parties proposed modifications to the Court's judgment, the arguments presented by the parties at the April 16, 1984 motion conference and the applicable law, the Court has determined that its order of March 2, 1984 requires modification.

It is accordingly, ORDERED, ADJUDGED and DECREED that the March 2, 1984 order of this Court is amended as set out herein. As a guide to the parties in this action, the Court determines that the EIS previously ordered should be prepared within the following parameters:

1. The geographic area to be considered in the EIS shall be composed of a reasonably determined ecological unit, specifically that area of Galveston Island known as "West Galveston Island" and its adjacent waters. This area should include all of the Teichman's Point peninsula southwestward of 77th Street. Across Offats Bayou from Teichman's Point, the northeastern boundary is Scholes Field. This boundary runs along the outer edge of the taxi-way paralleling runway 7–25, thence, along the outer edges of runways 13–31 and 13–35, and the extension of 17–35 past Stewart Road to a point just beyond the borrow pits, thence directly to the Gulf.

Galveston Island". AR 17:299. Section 706(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706, requires this Court to set aside an agency finding or conclusion found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law". The Corps' finding must be set aside because it is not in accordance with CEQ regulations. Whereas the CEQ definition of "significantly" compels an inquiry "whether the action is related to other actions", the Corps based its finding on an inter-

pretation requiring an inquiry "whether the action is related to any overall plan". The Corps "overall plan" language directs an analysis unwarranted by the CEQ definitions of "significantly" and "cumulative impact", and is inappropriate and fallacious in a case such as the instant one where the issue does not concern the need for a regional EIS as in *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

2. The character of the projects that shall be considered by the study shall include, but shall not be limited to, those developments, including residential developments—whether that development be simply a single unit or more than one unit—that incorporate dredged canals or lagoons and that are wholly or partially located upon lands that are subject to the jurisdiction of the Corps of Engineers under either section 10 of the River and Harbor Act of 1899, or section 404 of the Clean Water Act.

3. The topic of the study will be all past, present and reasonably foreseeable projects that may occur within the geographic area within five (5) years of the date of entry of this order.

It is further ORDERED, ADJUDGED and DECREED that the injunction previously extended by the Court's March 2, 1984 order is now amended by substitution of the following Injunction:

The United States Army Corps of Engineers is hereby enjoined from granting permit application No. 10260(04), or any other permit for the proposed Mitchell project required by either section 10 of the River and Harbor Act of 1899, or section 404 of the Clean Water Act, until the Corps completes an EIS which complies with all NEPA requirements and conforms to the parameters contained in Paragraphs 1 to 3 of this order. The Court further enjoins the Corps from granting any other permit applications for any similar projects, as defined by Paragraph 2 and located in the geographic area defined by Paragraph 1, until the Corps completes the EIS.